# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RYAN A. BECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-4266-JES |
| | ) | |
| COUNTY OF ROCK ISLAND and, | ) | |
| GERALD BUSTOS, as Sheriff of | ) | |
| Rock Island County | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER AND OPINION</u>

This matter is now before the Court on Defendants' Motion for Summary Judgment. Doc. 30 (the "Motion"). Plaintiff filed a Response (Doc. 31), and Defendants filed a Reply. Doc. 32. For the following reasons, the Motion is GRANTED in its entirety.

### Procedural Background

On December 18, 2020, Plaintiff Ryan A. Beck, *pro se*, filed suit against Brett Josie in his individual capacity as a medical provider and Mend Correction Care, Inc. ("MCC"), alleging a failure to provide adequate medical care in violation of 42 U.S.C. § 1983. Doc. 1 (the "Complaint"). Attorneys Jeffrey S. Deutschman (Doc. 9) and Bradley Alan Skafish (Doc. 10) each subsequently entered an entry of appearance on behalf of Mr. Beck. Mr. Beck then, through counsel, filed an Amended Complaint. Doc. 11. In it, Mr. Beck no longer named Mr. Josie or MCC as a defendant. *Id.* Instead, Plaintiff substituted Gerald Bustos, the Sheriff of Rock Island County, and the County of Rock Island (the "County") as Defendants. As to the basis for his cause of action, Mr. Beck alleges that the Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment while he was detained at the Rock Island County Jail

(the "Jail"). *Id.*[1] Specifically, Mr. Beck's allegations concern the delayed treatment of his infected

finger, which led to unnecessary pain and suffering, as well as loss of feeling in his right hand. *Id.*

Defendants filed an answer. Doc. 17. The Motion and related briefing followed.

**Material Facts[2]**

<u>Medical Treatment at the Jail</u>

During the relevant times, medical care at the Jail was provided by MCC, which had

contracted with Rock Island County. Doc. 30-3 (Josie Depo.) at 3. MCC employed numerous

medical personnel, including a Physician's Assistant (Mr. Josie), a Nurse Supervisor, Stephanie

Paxton, and three other nurses, as well as several health technicians. Doc. 30-2 (Paxton Depo.) at

12-13. Ms. Paxton reported to Michelle Scrock, the Director of Nursing, and Mr. Josie reported to

Dr. Todd Leonard. *Id.* On Mondays through Fridays, the medical clinic was staffed with a nurse

from 6:00 am to 10:00 pm, as well as a health technician for an additional hour until 11:00 pm. *Id.*

at 13.[3] Mr. Josie worked on-site at the Jail on Tuesday and Friday mornings and was typically on-

---

[1] Mr. Beck originally alleged a violation under the Eighth Amendment. However, in the context of constitutionally inadequate medical care, the Eighth Amendment applies to convicted prisoners, whereas the Fourteenth Amendment applies to pretrial detainees. The parties agree that Mr. Beck was a pretrial detainee, and so his claim is properly analyzed under the Fourteenth Amendment. This is significant, as the Eight Amendment's "deliberate indifference" standard is stricter than the Fourteenth Amendment's "objectively reasonable" test (discussed *infra*). Notably, Defendants' Motion briefing, as well as Mr. Beck's Response, now properly addresses Mr. Beck's claim as arising under the Fourteenth Amendment and applies the pretrial detainee standard.

[2] Notably, the exhibits provided by the parties as supplements to Doc. 30, Doc. 31, and Doc. 32 often contain duplicate filings. For example, Mr. Beck's deposition testimony is offered as Doc. 31-1 and Doc. 32-1, and Mr. Beck's treatment request and subsequent MCC provider notes are located at Doc. 31-1 at 25 and Doc. 32-2 at 40. When citing a document, the Court shall only refer to only one location in the record.

[3] It is unclear from the record as to how MCC was staffed during the weekends. Albeit, this is irrelevant, as the operative time period is July 20 to July 24, 2020, *i.e.*, Monday through Friday.

call during the week from 8:00 am to 5:00 pm. Doc. 30-3 at 3. Mr. Josie and Dr. Leonard alternated after-hours on-call provider duties. Doc. 30-2 at 5.

Detainees with medical concerns submitted their treatment requests in writing, also referred to as "kytes," using an electronic kiosk. *Id.* at 13.[4] Detainees were able to send these requests directly to the medical team, to be reviewed by an MCC nurse. *Id.* at 15. If upon assessing the severity of a medical request, the case appeared to be a medical emergency, a nurse would immediately see the detainee to decide whether to send him to an emergency room. *Id.* at 14. If the nurse was uncertain as to whether the medical issue was emergent, she would ask the on-call provider for guidance. *Id.* For non-emergencies, the MCC provider would put the detainee's name on a "medical call list" to be seen later at the Jail clinic. *Id.* at 4.

Apart from submitting medical requests to MCC directly, detainees were also able to submit grievances to the correctional officers, through the kiosk, to request medical treatment. Doc. 30-1 (Beck Depo.) at 12. Lieutenant Christopher Young and Lieutenant Bryan Browne had the responsibility to review these electronic grievances, as, respectively, the first and second shift commanders. Doc. 31-2 (Young Depo.) at 29. Mr. Young worked from 6:30 am to 2:30 pm, and Mr. Browne worked from 2:30 pm to 10:30 pm, Monday through Friday. *Id.* The shift commanders focused their review of grievances on those submitted on their shift. Doc. 31-1 (Browne Depo.) at 5; Doc. 31-2 at 13.

Detainees could direct their grievances to several destinations, including the "first shift command, second shift command, third shift command," and a general "shift command mailbox." Doc. 31-1 at 5, 7. Mr. Young, but not Mr. Browne, had access to the general "shift command

---

[4] Notably, detainees would, at times, inform health techs during "med pass" of health issues, but health techs advised the detainees to use the kiosk to submit a kyte to MCC directly. Doc. 30-2 at 4-5. Med pass is a term to describe the dispensation of medications to detainees.

mailbox." *Id.* at 7.[5] Additionally, detainees were free to raise medical concerns with correctional staff during "watch tours," where every 30 minutes a correctional officer walked through the common room. Doc. 31-2 at 4. Or, detainees could voice their concerns over an intercom system that was connected to the "control panel."  [6]

Regardless of the method a detainee chose to inform a correctional officer of a medical issue, the request would be forwarded to MCC. Doc. 31-1 at 4. But if the medical issue was an "obvious emergency," such as bleeding, then a correctional officer had the discretion to immediately involve the medical team. *Id.* And, the decision of whether to transfer an inmate to an emergency room is ultimately within an MCC provider's ambit. Doc. 30-2 at 14.

Events Surrounding Plaintiff's Injury

Mr. Beck was incarcerated at the Jail between July 3 and July 24, 2020. Doc. 30-1 at 6.[7] When he arrived at the Jail, he was given an "inmate handbook," which seemingly contained information concerning health care. *Id.* at 10; *see* Doc. 31 at 12. Mr. Beck was housed on W Block during the relevant time period. Doc. 31-2 at 4. In that block, he had 24-hour access to the "open day room" where the kiosk was located. *Id.* The kiosk itself, however, was only operable between 7:00 am and approximately 11:00 pm. *Id.*[8]

---

[5] It is not clear as to who else, if anyone, had access to the general shift command mailbox.

[6] The record does not indicate what the term "control panel" refers to, but it appears that someone on the other end of the intercom would listen to the detainee's concern. *See* Doc. 31-2 at 8. Furthermore, Mr. Young also indicates that detainees may inform health techs of a medical concern during med pass. *Id.* at 4. This, however, contradicts Ms. Paxton's testimony.

[7] Mr. Beck was 37 years old at the time. Doc.30-1 at 94.

[8] In some units, it appears that some prisoners submit paper kytes. Doc. 30-2 at 13. Mr. Beck testified that he submitted paper kytes on July 17 and July 18, 2020, as he was housed in a unit that did not utilize a kiosk. Doc. 30-1 at 25. Paper kytes were not sent directly to MCC, rather, a corrections officer would pick up the kyte and deliver it to the medical clinic. Doc. 30-2 at 13.

On July 20, 2020, Mr. Beck began to experience pain and swelling in his right index finger. Doc. 30-2 at 6.[9] ; *see also* Doc. 32-1 at 122. He reported his injury to a health tech during med pass, who advised him to file a medical care request on the kiosk. Doc. 32-2 at 40; *see also* Doc. 30-1 at 14.

On July 22, 2020, Mr. Beck filed a medical request kyte directly to MCC regarding his finger injury.[10] The kyte and MCC's response, read as follows, Doc. 32-2 at 44:

| Request Number: | 394869 | Status: CLOSED | Inmate Name: | BECK, RYAN BLAKE |
|---|---|---|---|---|
| Initial Location: W DAYROOM 15 1 | | | Current Location: | |
| Inmate Number: | 1736847 | | Inmate Secondary Number: | 194923 |

| Stamp | Action Detail | User |
|---|---|---|
| 07/22/2020 07:09 am | ORIGINAL REQUEST: | |
| | FOR THE LAST 2 DAYS MY POINTER FINGER HAS SWELLED BEYOND ITS NORMAL SIZE.. IVE SHOWN THE MEXICAN NURSE SEVERAL TIMES AND SHE HASNT DONE NOTHING BUT BLOW ME OFF ..THIS HAS BECOME AN EMERGENCY | |
| 07/22/2020 11:44 am | RESPONSE: | S6928 |
| | will call to clinic. $10 fee will apply | |
| 07/22/2020 11:45 am | CLOSED: | S6928 |
| | <NO COMMENT GIVEN> | |

Approximately 10 hours later, at 5:15 pm, Mr. Beck was seen by an MCC nurse, Rosi Monzoon. Doc. 32-1 at 16.[11] Ms. Monzoon examined Mr. Beck, photographed his injury, and told

---

[9] In Mr. Beck's answers to Defendants' interrogatories, he stated that he reported his finger injury as early as July 17, 2020, through paper kytes and complaints to Jail staff. Doc. 32-1 at 53-56. However, these requests are not proffered into the record, despite Mr. Beck's assertion that he made copies of the paper kytes that were "at home" in his "own records". Doc. 30-1 at 25. Furthermore, the evidence that is in the record, particularly two of Mr. Beck's separate electronic kytes dated July 22, 2020, and November 3, 2020, indicates his finger injury began on July 20, 2020. *See* Doc. 32-2 at 114, 122.

[10] He also filed a kyte pertaining to a pre-existing knee injury on that same day, but the Court's mention of the July 22, 2020, medical kyte is only used to refer to Mr. Beck's concerns over his right hand. *See* Doc. 32-2 at 42.

[11] The record is not consistent as to how Ms. Monzoon's last name is spelled. *See, e.g.*, Doc. 30 at 12 (spelled "Monson").

him that she would send the photograph to the doctor and follow up as needed. Doc. 32-2 at 40.[12]

Thirty minutes after being seen by Ms. Monzoon, Mr. Beck filed a grievance with the second shift

command. The grievance and Mr. Beck's interaction with Mr. Browne (*i.e.*, second shift

command), are provided here, Doc. 32-2 at 37:

| Request Number: | 394943 | | Submitted: | 7/22/20   5:48 pm |
|---|---|---|---|---|
| Inmate Number: | 1736847 | | Type: | SHIFT COMMAND |
| Inmate Secondary Number: | 194923 | | Sub Type: | 2ND SHIFT COMMAN |
| Inmate Name: | BECK, RYAN BLAKE | | | |
| Initial Location: W DAYROOM 15 1 | | | Current Location: | |

| Stamp   Action   Detail | User |
|---|---|
| 7/22/2020   5:48:37PM<br>ORIGINAL REQUEST:<br>I SEEN THE NURSE EARLIER OVER MY FINGER HAVING SOME INFECTION WHICH IS SPREADING DOWN THROUGH MY HAND IM IN EXTREME PAIN AND IN WORRIED. THIS DEFINATLY IS NOT A JOKE PLEASE LOOK INTO THIS I NEED EMERGANCY ATTENTION I KNOE THIS BECAUSE OF HOW FAST ITS SPREADING | |
| 7/22/2020   5:49:28PM<br>RESPONSE:<br>Mr. Beck,<br><br>I will forword your concern to the medical staff.<br><br>Lt. Browne | S6587 |
| 7/22/2020   5:49:35PM<br>GROUP ASSIGNED CHANGED TO MEDICAL | S6587 |
| 7/22/2020   6:36:58PM<br>INMATE RESPONSE:<br>THANK U IM NOT BEING A BUG IM JUST SEEING ITS WORSENIG STAYING CONSISTANT N IM KINDA SPOOKED. | |

The next morning, on July 23, 2020, at 6:02 am, Mr. Beck called and complained to an

unspecified corrections officer that his finger was not "getting enough circulation." Doc. 32-1 at

---

[12] It is unclear whether Ms. Monzoon actually sent the photo to the provider. Mr. Josie testified to receiving a photo of the finger on July 23, 2020, and he was unable to say whether a photo was also sent on July 22, 2020. Doc. 30-3 at 9. It is possible that Ms. Monzoon sent the photograph to Dr. Leonard since the notes indicate that she would send it to the "doctor." Doc. 32-2 at 40. But the record does not contain any further information on that July 22, 2020, photo.

108. The corrections officer visited Mr. Beck and noticed that his finger was "big and swollen," so he called Ms. Paxton who said Mr. Beck would be seen later that morning. *Id.*

Mr. Beck was seen by Ms. Paxton at 7:45 am on July 23, 2020. Doc. 32-2 at 37. Ms. Paxton, like Ms. Monzoon the night before, took Mr. Beck's temperature, examined him, and took a photo of his finger to send Mr. Josie. *Id.* Ms. Paxton sent the picture of Mr. Beck's finger approximately 1 hour later at 8:56 am. Doc. 32-2 at 40. Mr. Josie then ordered a prescription for Keflex, an antibiotic, to be given to Mr. Beck to treat his finger, as it appeared infected. *Id.* at 22; *see also id.* at 32 (Keflex pharmacy order). And, Mr. Josie prescribed Tylenol for Mr. Beck's pain. *See id.* at 36; *see also id.* at 33 (Tylenol pharmacy order). Several hours later, at 12:16 pm, Mr. Beck walked into the clinic complaining about his finger. *See* Doc. 32-2 at 36. An unnamed nurse examined Mr. Beck's finger and indicated that he would receive the antibiotic during the next med pass. *Id.*

That same day, on July 23, 2020, at 3:12 pm, Mr. Beck forwarded the following grievance to shift command, indicating that he needed emergency care and that MCC was not providing proper treatment, Doc. 32-2 at 34:

| Request Number: | 395017 | Submitted: | 7/23/20  3:12 pm |
| Inmate Number: | 1736847 | Type: | SHIFT COMMAND |
| Inmate Secondary Number: | 194923 | Sub Type: | GRIEVANCE |
| Inmate Name: | BECK, RYAN BLAKE | | |
| Initial Location: W DAYROOM 15 1 | | Current Location: | |

Stamp  Action Detail                                   User

7/23/2020  3:12:15PM
   ORIGINAL REQUEST:
   DAY 3 2 DAYS NOW THE NURSES HAVE TAKEN PICS OF MY FINGER THAT HAS SWELLED TO THE
   POINT I CAN DO ANYTHING. IM IN PAIN TO THE EXTREME AND THE MEDICAL PERSONAL HAS MADE
   NO ATTEMPT TO HELP THE SWELLING NOR THE PAIN. THIS IS AN EMEREGANCY N ITS BEING
   TREATED LIKE ITS NOTHING .. I WANT TO BE TAKEN TO THE E,R

The grievance was not addressed until the following morning (*i.e.*, July 24, 2020) at 6:50 am, at which point it was forwarded to MCC. *Id.* Such a delay in addressing the grievance was

characterized by Mr. Young as "unusual" and he also noted that it "should have been forwarded sooner than that." Doc. 31-2 at 8.

All the while, throughout July 22 and July 23, 2020, Mr. Beck complained to "everyone that came" into his block about his injured finger. Doc. 30-1 at 23. Mr Beck also complained to Officer Pat Rawlings about his finger on the morning of July 24, 2020. *Id.* at 23. Furthermore, the parties dispute whether Mr. Beck received a dose of the antibiotic prescribed to treat his finger.[13]

At 7:00 am on July 24, 2020, Mr. Beck was seen by Mr. Josie at the clinic. Doc. 32-2 at 34. Mr. Josie diagnosed Mr. Beck with finger cellulitis, "a type of skin infection," Doc. 30-3 at 10, and indicated that because the infection was not improving he would send Mr. Beck to the emergency room. *See* Doc. 32-2 at 43. Mr. Beck was admitted to UnityPoint Health's emergency department that morning at 9:03 am. Doc. 30-1 at 62; *see also id.* at 19.

At the hospital, Mr. Beck was diagnosed with flexor tenosynovitis of the right index finger. *Id.* at 68. Notably, this diagnosis is not "distinct" from Mr. Josie's earlier diagnosis of finger cellulitis. Doc. 30-3 at 10. To treat the infection, the provider recommended and subsequently performed an irrigation and debridement procedure on Mr. Beck's right index finger, to drain pus from his finger. Doc. 30-1. at 65. Mr. Beck testified that the provider indicated to him that if he chose not to do the procedure, he may lose his hand. *Id.* at 21. During the procedure, the surgeon

---

[13] Mr. Beck testified at his deposition that he never received the antibiotic. Doc. 32-1 at 26. Defendants point to the "Medication Administration Record" which appears to indicate that he received the antibiotic. Doc. 30-2 at 18; *see also* Doc. 32-2 at 35 (Medication Administration Record). Notably, the medication record does not include Keflex, and instead utilizes the name "Cephalexin." Doc. 32-2 at 35. Mr. Josie stated that Keflex is the "same thing" as Cephalexin. Doc. 30-3 at 13.

found pus and drained his finger. *Id.* at 74, 80. The parties dispute whether Mr. Beck discharged himself the next day.[14]

As a result of his injury, Mr. Beck alleges that he suffered nerve damage and cannot feel anything in part of his hand. *Id.* at 21.[15] His injury has impacted his recreation, as he can no longer "bounce a basketball correctly." *Id.* at 24. Furthermore, Mr. Beck describes himself as an "artist" who can no longer "draw" and as a trained welder who likely "cannot run a good welding bead." *Id.* Indeed, Mr. Beck's injury impacts him on a daily basis, as he sometimes will "hold a cup" and then "drop it" because of the numbness. *Id.*

## Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 7477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Id.* at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations, or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183(7th Cir. 1993).

---

[14] The hospital records indicate that Mr. Beck was discharged on July 25, 2020, at 11:55 am against the advice of the medical provider. *See* Doc. 30-1 at 72. In contrast, Mr. Beck testified at his deposition that he remained in the hospital for four days prior to discharging himself, still, however, against the hospital's recommendation. Doc. 30-1 at 19.

[15] Mr. Beck has not seen a nerve specialist to try and remedy his loss of feeling. Doc. 30-1 at 22.

The non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256-57 (1986) (quotation and citation omitted)); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 250.

## Discussion

Mr. Beck alleges that the Defendants are liable under § 1983 for violating his constitutional rights by displaying deliberate indifference to his serious medical needs. Doc. 11 at 3.[16]

<u>Characterization of the Suit</u>

As a threshold matter, the parties' combined briefing, as well as the Amended Complaint itself, lack clarity as to Mr. Beck's legal basis to bring suit against the Sheriff and the County.

In the Seventh Circuit, when a plaintiff "fail[s] to designate expressly the nature of the suit through the utilization of the terms 'official capacity' or 'individual capacity,' but [] list[s] in the case name of the complaint the official's job title," district courts may view such complaints as "official capacity" suits. *Kolar v. Cnty. of Sangamon*, 756 F.2d 564, 568 (7th Cir. 1985); *see also Estate of Smith by Bryfczynski v. Oneida Cty.*, 541 F. Supp. 3d 903, 915 (W.D. Wis. 2021). However, a district court should also look to whether "'the complaint alleges the tortious conduct of an individual acting under color of state law,'" because in such cases "'an individual capacity

---

[16] As noted *supra*, Mr. Beck's claim is not analyzed under the deliberate indifference standard despite using such language in the Amended Complaint.

suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint.'" *Davis v. City of Chi.*, 669 F. App'x. 305, 306 (7th Cir. 2016) (quoting *Hill v. Shelander*, 924 F.2d 1370, 1373-74 (7th Cir. 1991)). Additionally, "when the plaintiff seeks injunctive relief, then he has brought an official-capacity suit; when the plaintiff seeks damages, then his case is a personal-capacity suit." *Phillips v. Illinois Dep't of Fin. and Prof'l Regulation*, 718 F. App'x. 433, 435 (7th Cir. 2018) (citing *Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000)).

Here, the Amended Complaint does not state whether the Sheriff is being sued in his official or individual capacity. But, to the extent the allegations are lodged against "GERALD BUSTOS, as Sheriff of Rock Island County," Doc. 11 at 1, it appears that Mr. Beck's intention is to hold Mr. Bustos liable in his official capacity as Sheriff. Indeed, the Amended Complaint seeks injunctive relief, a remedy available in an official capacity suit, in the form of an "order forcing Defendants to provide Plaintiff with and refrain from interfering with all necessary follow up care for his finger and any other medical conditions which may arise in his confinement." *Id.* at 4. Yet, the Amended Complaint also seeks punitive damages, *id.* at 5, which can only be awarded in an individual capacity suit. *See Selmani v. Village of Bartlett,* 515 F. Supp. 3d 882, 888-89 (N.D. Ill. 2021) (citations omitted). Thus, it is unclear whether Mr. Beck is suing Mr. Bustos in his official or individual capacity. In an abundance of caution, the Court shall address both modes of liability.

There are other nuances in the briefing that necessitate further review of the suit's nature.

For example, the Defendants cite *Krigbaum v. Sangamon Cnty. Ill. Sheriff's Dep't*, JES-06-3236, 2007 WL 2701230 (C.D. Ill. Aug. 6, 2007), to support its argument that any claim against Mr. Bustos in his official capacity "is redundant and should be dismissed because Beck is also suing Rock Island County." Doc. 30 at 9. However, the court in *Krigbaum* stated that a suit against a sheriff in his individual capacity was redundant because the complaint also named the sheriff's

11

department. *Id.* at 4; *see also Harris v. Rockford Police Dep't*, IDJ-10-50168, 2021 WL 1885979, at *1 (N.D. Ill. May 10, 2021) (same). Thus, the Defendants' argument is distinguished on the basis that Mr. Beck lodges a claim against the County and does not name the Rock Island Sheriff's Department as a defendant.

Furthermore, the proposition set forth in *Krigbaum* is not so well-settled. *Krigbaum* relied on *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992). In that case, the Seventh Circuit held that a claim against city police officers in their official capacities operated as a claim against the city itself. But "[t]he county sheriff is specifically designated as a county officer under the Illinois Constitution," and so a sheriff is not subject to the same treatment as a typical city police officer. *Stephens v. Collins*, RMD-20-2433, 2021 WL 357514, at *2 (N.D. Ill. Feb. 2, 2021) (citing *Scott v. O'Grady*, 975 F.2d 366, 370 (7th Cir. 1992) in turn citing Ill. Const. art. VII, § 4(C)); *see also Posey v. Pruger*, 762 F. Supp. 2d 1086, 1090 n.2 (N.D. Ill. Jan. 3, 2011) ("This attribute of Illinois sheriffs distinguishes them from municipal police departments like the CPD.").

Moreover, district courts are split on the issue of whether an Illinois sheriff's department is even a legal entity that can be sued. *See Leinenweber v. DuPage Cnty.*, BMM-08-3124, 2009 WL 458622, at *3 (N.D. Ill. Feb. 23, 2009) (allowing claim to proceed against the DuPage County Sheriff's Office); *see also Lavite v. Dunstan*, DRH-16-882, 2018 WL 1535491, at *9 (S.D. Ill. Mar. 29, 2018) (dismissing Madison County Sheriff's Department from the action as not having a legal existence). However, it is also true that district courts routinely state that an official capacity claim against a sheriff is tantamount to a claim against the governmental entity that he represents, *i.e.*, a sheriff's department. *See, e.g.*, *Wells v. Bureau County*, 723 F. Supp. 2d 1061, 1081 (C.D. Ill. July 2, 2010). This approach implicitly endorses the availability of an action against a sheriff's

department, as it would be nonsensical to find a claim against the sheriff to be equivalent to a claim against the department if the department could not be subject to such a claim.

The Seventh Circuit appears to have taken an inconsistent approach as to whether a sheriff's department is a legal entity subject to suit, at least with respect to the underlying rationale. On the one hand, the Seventh Circuit clearly stated that "claims against the Sheriffs in their official capacities are really against the Kane County [Illinois] Sheriff's Office." *Bertha v. Hain*, 787 F. App'x. 334, 339 (7th Cir. 2019) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).[17] This conclusion supports the notion that a sheriff's department can be sued. But at the same time, the Seventh Circuit has noted that "[t]he liability of the Sheriff's Department and of the County is derivative of [the Sheriff's] official-capacity liability." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). This statement, while not absolutely foreclosing the possibility that a sheriff's department could be sued independently, indicates that the real party in interest would be the sheriff himself, so a suit against the department would appear to be misguided. This is perhaps because, in a traditional official capacity suit, the entity ultimately liable for damages will typically be the same entity for which the official exercises his policymaking authority.

Dissimilarly, and relevant here, is that "in most circumstances Illinois sheriffs, while agents of the county for which they work, are independently elected officials not subject to a county's respective control… and, therefore, liability cannot be imputed to a county based on a Sheriff's actions." *Potochney v. Doe*, JHL-02-1484, 2002 WL 31628214, at *2 (N.D. Ill. Nov. 21, 2002) (citations omitted). Yet, a county is still ultimately responsible for damages arising from a

---

[17] The Seventh Circuit's reliance on *Hafer*, 502 U.S. 21, is questionable, as *Hafer* is distinguished on the basis that it involved a Pennsylvania state official and treatment of such an official does not appear to always apply to an Illinois county sheriff. Though, on this day, the Court need not engage in such a foray.

sheriff's actions. *See Carver v. Sheriff of LaSalle Cnty.*, 787 N.E.2d 127, 141, 272 Ill. Dec. 312, 203 Ill.2d 497 (2003) (relying on 745 ILCS 10/9–102 in conjunction with 55 ILCS 5/4–6003 and 5–1106)). And so, naming a sheriff's department would have an oblique and seemingly tenuous effect, if such a suit is even a legal possibility. It is also worth stressing that in the string of *Carver* cases, discussed *supra* and *infra*, the district court initially granted the sheriff's department's motion to dismiss on the basis "that it is not a legally independent entity and, therefore, not suable." *Carver v. Condie*, CRN-94-2240, 1997 WL 321910, at *1 (N.D. Ill. June 10, 1997). Both the Seventh Circuit and the Illinois Supreme Court had the opportunity to comment on that decision but abstained from discussing the status of the sheriff's department as a suable legal entity.

One reason for the general confusion in this area of the law is that, in some matters, such as the case *sub judice*, only the sheriff and the county are named. As such, if a sheriff's actions cannot be imputed to a county, and if the sheriff in his official capacity is the proper target of a suit, then how can municipal liability possibly attach? After all, it does not seem reasonable to characterize an individual as a local government. In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court stated, *id.* at 690 n.55 (emphasis added): "…[O]ur holding today that local governments can be sued under § 1983 necessarily decides that ***local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name***." And so, if the sheriff's department is not suable in its own name, it does not appear that under *Monell* the sheriff would be suable in his official capacity under § 1983. District courts seem to recognize this, and without a detailed explanation, routinely indicate that a suit against a sheriff in his official capacity is somehow tied to the sheriff's department. *See, e.g., Lawrence v. Dart*, SCS-21-1375, 2022 WL 220303, at *6 (N.D. Ill. Jan. 25, 2022). The case that courts look to for this proposition, whether

14

directly or through omitted string citation, is *Franklin v. Zaruba*, 150 F.3d 682 (7th Cir. 1998). *See, e.g., Mitter v. Cnty. of DuPage*, GF-13-841, 2013 WL 5951810, at *1 (N.D. Ill. Nov. 7, 2013).

In *Franklin*, the court addressed whether a sheriff was entitled to Eleventh Amendment Immunity from suit as an agent of the state, in light of the Seventh Circuit's previous holding that counties may not be held liable under *respondeat superior* for the actions of their sheriffs. *Franklin*, 150 F.3d at 685. The court answered in the negative, and in citing the teachings of *Ryan v. Cnty. of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995), and *Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989), *cert. denied*, 495 U.S. 929 (1990), stated, *Franklin*, 150 F.3d at 685 (emphasis added): "[The sheriff's] argument overlooks a crucial third possibility that we have found to be dispositive in other cases—namely, that the ***sheriff is an agent of the county sheriff's department***, an independently-elected office that is not subject to the control of the county in most respects." The court's statement, however, is problematic.

For one, in stating that the sheriff acted as an agent of the department, the court misconstrued the nature of the relationship between the sheriff and the department. As a later Seventh Circuit panel later quoted, "'[w]ithin the sheriff's prescribed range of activity, he and not some legislative-type body is at the apex of the governmental pyramid.'" *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 n.2 (7th Cir. 2000) (quoting *Hvorcik v. Sheahan*, 847 F. Supp. 1414, 1417 n.7 (N.D. Ill. 1994)).[18] In other words, any duties, management of employees, and

---

[18] The terms "sheriff's office" and "sheriff's department" are used interchangeably throughout the Illinois County Code, 55 ILCS 5, as well as the relevant case law. Further complicating this issue is the lack of articulation throughout the judicial opinions that this Court has reviewed, as to whether the term "sheriff's office" refers to the sheriff's individual capacity, *i.e.*, his "special duty or position of authority" or to the office generally, as defined to mean "a special administrative department or unit." Legal Definition, Office, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/office (last accessed Nov. 1, 2023).

other actions carried out by the sheriff's department are ultimately attributable to the sheriff himself. In support of this assertion, one need not look further than the possessory language, *i.e.,* the sheriff***'s*** department, indicating that the department operates at the behest of the sheriff. So, in concluding that the sheriff was an agent of the "department," the *Franklin* court mischaracterized the flow of responsibilities, and in doing so, arguably created a legal fiction to allow for the easy attachment of *Monell* liability to a county sheriff. And, the *Franklin* court created an entirely new issue: If the premise of its statement concerning a sheriff's department's amenability to suit relies on the sheriff acting as an agent of the department, and the relevant law does not support the notion that the "department" can carry out a policy outside of the sheriff's direction, how can the office be a legal entity?[19] If the sheriff is an agent, who, or what, is the sheriff's master?[20] In this way, the *Franklin* court seems to have left the door ajar, with no clear alternative, as to whether an Illinois sheriff's department should be considered, as is the case in Wisconsin, "a division of the

---

This distinction, or lack thereof, is especially relevant to the *DeGenova* court's holding. In particular, the court cited *Franklin*, 150 F.3d at 685, to support its conclusion that a "Sheriff's office has a legal existence separate from the county and the State, and is thus a suable entity." *DeGenova*, 209 F.3d at 976 n.2. Courts have interpreted this very quote to indicate the existence of a sheriff's "department" that is capable of being sued, but one has to wonder if that is the correct interpretation, since it appears the more common use of the word in this context is to refer to a sheriff's unique position of authority. *See, e.g., Hower v. Cook County Sheriff's Office*, SD-15-6404. 2016 WL 612862, at *2 (N.D. Ill. Feb. 16, 2016); *Mordi v. Zeigler*, MJR-SCW-11-193, 2012 WL 2573249, at *2 (S.D. Ill. June 14, 2012), *report and recommendation adopted*, 2012 WL 2577488 (S.D. Ill. July 3, 2012); *Snyder v. Hall*, MMM-06-1038, 2009 WL 1475372, at *3 (C.D. Ill. May 27, 2009).

[19] As one court noted, "[a] sheriff's department or sheriff's office is not legally independent of the sheriff himself…" *Willenborg v. Ozier*, JPG-09-1002, 2010 WL 1416059, at *1 (S.D. Ill. Apr. 1, 2010) (citing *Magnuson v. Cassarella*, 812 F. Supp. 824, 827 (N.D. Ill. 1992)). It seems paradoxical to suggest when a first entity (*i.e.*, the department) is dependent on a second entity (*i.e.*, the sheriff), the second entity can subordinate itself to the first entity.

[20] Without the Seventh Circuit's characterization of the sheriff as an agent of his department, this Court would be inclined to conclude that an Illinois sheriff is simultaneously an individual person as well as a governmental entity, and thus subject to *Monell* liability.

county and not a justiciable entity." *Wagner v. Washington County*, 493 F.3d 833, 835 (7th Cir. 2007).[21] Such reasoning runs afoul of established precedent, as the logical result is that the sheriff would be an agent or employee of the county rather than an independently elected official. *See Martinez v. Sgt. Hain*, RMD-16-2237, 2016 WL 7212501, at *4 n.1 (N.D. Ill. Dec. 13, 2016) (collecting cases).

However, at least one district court seems to think that the rationale underpinning the established precedent is wrong. Judge Coar, after careful and thoughtful analysis, found that an Illinois sheriff was a final policymaker for his county and therefore the county was liable for the actions of the sheriff and his office. *Hernandez v. Cnty. of DuPage*, DHC-96-8030, 1997 WL 598132, at *6-9 (N.D. Ill. Sept. 19, 1997) (applying *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781 (1997)); *but see Martinez v. Sgt. Hain*, RMD-16-2237, 2016 WL 7212501, at *4 n.2 (N.D. Ill. Dec. 13, 2016) (declining to follow *Hernandez*). Additionally, the Seventh Circuit seems to have, in a recent opinion, impliedly adopted this approach as well. *See McCann v. Ogle Cnty.*, 909 F.3d 881, 888 (7th Cir. 2018) ("What remains is the *Monell* claim for municipal liability against Ogle County. This claim includes the allegations McCann's estate advances against Sheriff Beitel and Captain Kerwin in their official capacities.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). This line of reasoning certainly seems to add force to Defendants' argument that the suit against the County and Sheriff Bustos together, for the purpose of assessing accountability, is superfluous. But, regardless of whether the Court adopts the approach in *Hernandez* or instead views the complaints against Mr. Bustos as arising in his official capacity, detached from the

---

[21] This issue raises concerns beyond whether a sheriff's department can be sued, as the holding in this series of cases has been extended to permit suit against the departments of other independently elected officials. *See, e.g.*, *Connelly v. Cook Cnty. Assessor's Office*, 583 F. Supp. 3d 1142, 1145-47 (N.D. Ill. 2022) (concluding that a county assessor's office is a suable entity).

County, it would be redundant to find the County had potential liability as well. And so, the Court appropriately severs any argument pertaining to the County's blameworthiness when addressing Mr. Beck's *Monell* claim as to Bustos in his official capacity as Sheriff.

Ultimately, this Court need not address, at this time, whether 1) a sheriff's department is a legal entity subject to suit, 2) a sheriff is the final policymaker of a county, 3) a suit against a sheriff is in reality a suit against his office, or 4) a sheriff, himself, constitutes a local government unit capable of being sued under § 1983. And so, the Court returns to the Seventh Circuit's binding precedent, however porous, in finalizing its analysis of the suit's characterization.[22]

"Illinois law provides that a county sheriff, and not the county itself, has 'custody and care' of the county jail and its operations." *Albarran v. Dart*, MSS-21-1024, 2022 WL 1556103, at *3 (N.D. Ill. May 17, 2022) (quoting 55 Ill. Comp. Stat. 5/3–6017)). Additionally, "[t]he Seventh Circuit has previously found that Illinois Sheriffs are the final policymakers for sheriff's departments." *Parker v. Ringhausen*, NJR-19-948, 2020 WL 1915279, at *2 (S.D. Ill. Apr. 20, 2020) (citing *Ryan v. Cnty. of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995)). Thus, any alleged constitutional violations arising out of a custom, practice, or policy at the Jail appear to be only attributable to Sheriff Bustos, although the Court cannot foreclose situations where a County policy could affect the Sheriff's Department and form a basis for independent County *Monell* liability. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 n.4 (7th Cir. 2010) ("…the jury had sufficient basis to find that the failure to retrieve and act on the detainees' medical requests[, ]which implicates the County's unofficial practice or custom[]…"). The facts before this

---

[22] It is amusing that even Mr. Young testified that he was a county employee rather than an employee of the Sheriff's Department. *See* Doc. 31-2 at 11. This in and of itself seems to exemplify the complexity of the issue, and it is further reflected, as discussed *infra*, in connection with testimony regarding which entity contracts with MCC.

Court present one such example, as the County, not the Sheriff, contracts with MCC to provide detainees with medical care. Doc. 30 at 1-2.

And, as alluded to, "a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer ... [and][b]ecause state law requires the county to pay, federal law deems it an indispensable party to the litigation." *Carver v. Sheriff of LaSalle Cnty*, 324 F.3d 947, 948 (7th Cir. 2003); *see also Olson v. Champaign Cnty., Ill*., 784 F.3d 1093, 1104 (7th Cir. 2015). Thus, in this regard, the County must be a party to the suit to indemnify Mr. Bustos for any liability incurred while acting within the scope of his duties as sheriff. *See Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 636–37 (7th Cir. 2009).[23]

In sum, the Court shall assess Mr. Bustos's official and individual liability under § 1983. To the extent that Mr. Bustos is liable, it seems the County would be required to cover any ensuing damages. The Court shall also assess the County's independent liability for having contracted with MCC to provide medical services in the Jail, as there is no other basis for which to hold the County independently liable under § 1983.[24]

---

[23] The Court notes that a county's duty to indemnify a sheriff applies to both personal and official capacity liability under § 1983. *See Wallace v. Masterson*, 345 F. Supp. 2d 917, 923-27 (N.D. Ill. 2004). However, to the extent that a constitutional injury is caused by "wilful misconduct," which may be the case in many personal capacity suits under § 1983, it would appear that a sheriff would be stuck paying his own judgment. 55 ILCS 5/5–1002.

[24] As a prefatory note prior to diving into the meat of Mr. Beck's § 1983 claim, it must be highlighted that this "case suffers from seismic evidentiary gaps" with respect to any policy implemented by the Sheriff or the County. *Harris v. Cnty. of Cook*, SCS-19-4598, 2022 WL 425716, at *10 (N.D. Ill. Feb. 11, 2022). Even though "[j]udges are not like pigs, hunting for truffles buried in briefs," the Court has scoured the record to little avail. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Perhaps the analogy is inapt, as it is currently white truffle season and so a truffle pig would likely find a truffle, whereas this Court is hard-pressed to conclude that the evidence can support the existence of a constitutionally violative policy. Not to belabor the point, but the Court shall again touch on the dearth of evidence in connection with its analysis of *Monell* liability. Furthermore, the alleged underlying constitutional violations, as the

Underlying Constitutional Injury

"To begin, a § 1983 plaintiff must always show that he was deprived of a federal right." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citation and quotation omitted); *see also Marvin v. Holcomb*, 72 F.4th 828, 833 (7th Cir. 2023) ("[W]ithout an underlying constitutional or statutory violation, there can be no § 1983 liability."). Furthermore, "to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages.'" *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)); *see also Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("[Plaintiff's] claim fails on the basic proposition that he has sued for damages under § 1983 and alleged a constitutional tort [] without then developing evidence of a recoverable injury.") (citing *Wilson v. Garcia*, 471 U.S. 261, 278 (1985)); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort [and] [a] tort to be actionable requires injury.").

Because Mr. Beck was a pretrial detainee, his rights arose under the Fourteenth Amendment. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Detainees are entitled to adequate medical care. *Id*. at 353-54. To establish a Fourteenth Amendment violation, a detainee must show: "(1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm." *Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 828 (7th Cir. 2022) (citation and internal

reader will soon discover, are tenuous at best. The Court would state that these alleged violations are hanging on by a thread, but that would be too generous a characterization.

quotation marks omitted). In determining whether a challenged action is reasonable, the court must consider the "totality of facts and circumstances." *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020).

The parties do not dispute that Mr. Beck has a serious medical need. Indeed, his finger was severely infected and ultimately required surgical treatment. Less clear is the question of which individuals, or for that matter, which entities, were positioned to actually have caused the alleged constitutional violation. The parties' briefing is largely scant with a discussion of the responsible individual actors. It appears to the Court, however, that the analysis is appropriately bifurcated into two categories. First, was there a violation caused by an MCC medical provider? Second, was there a violation caused by a correctional officer? The Court addresses these questions in turn.

As to the MCC providers, it certainly appears reasonable to prescribe Mr. Beck an antibiotic medication to treat his hand infection the day after he reported his injury through the kiosk system.[25] It also seems reasonable for the MCC providers, upon examination the following day, to determine that the Mr. Beck required greater care and send him to the emergency room.[26]

---

[25] "Through a bureaucracy that diffuses individual responsibility and accountability, healthcare in a prison or jail may be delivered (or not delivered) so that it is difficult or even impossible to assign the individual responsibility for deliberately indifferent failure that offers the simplest path to § 1983 liability." *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 655 (7th Cir. 2021). And so, the Court need not look to any individual MCC care provider in concluding that a reasonable jury may find that MCC employees cumulatively deprived Mr. Beck of a constitutional right.

[26] Notwithstanding the MCC providers' possible recklessness discussed *infra*, a reasonable jury could find that "the totality of the care provided" was constitutionally adequate. *Clark v. Wexford Health Sources, Inc*., 833 F. App'x. 18, 22 (7th Cir. 2020) (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)). This is despite Mr. Beck's averment that he should have been taken to the emergency room immediately, as he "not entitled to specific treatment, only constitutionally adequate care." *Armstead v. Marandet*, No. 20-2891, 2021 WL 5492983, at *3 (7th Cir. Nov. 23, 2021) (citing *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019)).

However, there is a dispute of material fact as to whether Mr. Beck actually received the antibiotic medication.[27]

"A reasonable jury [] could resolve this inconsistency in [Mr. Beck's] favor," and in doing so, the jury "could also conclude that [the MCC providers] acted with purposeful, knowing, or reckless disregard of the consequences as well as in an objectively unreasonable manner." *Jackson v. Sheriff of Winnebago Cnty., Ill.*, 74 F.4th 496, 503 (7th Cir. 2023) (citations omitted).[28] And so, to the extent that it is alleged that the MCC providers violated Mr. Beck's rights by failing to provide him with antibiotics, it shall be reviewed in connection with the County, as it is the entity that contracts with MCC.[29]

As to the correctional officers, Mr. Beck alleges that he was denied constitutionally adequate medical care as, despite ample notice of his predicament, through the grievance procedure and otherwise, the correctional officers did not secure proper treatment.

I pause to note that, non-medical personnel, like the officers here, are generally justified in relying on the instructions of medical professionals. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005); *see, e.g., Tyner v. Nowakowski*, JRB-19-1502, 2021 WL 4318085, at \*4 (N.D. Ill. Sept.

---

[27] Even if Mr. Beck did not receive the antibiotics, the record is far from clear that the day-long delay in Mr. Beck receiving his medication was the cause of his injuries. *See Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 680 (7th Cir. 2023) (finding that plaintiff failed to support his claim that "the ten-day gap in medical care caused him some harm.") (citing *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007)).

[28] A jury could also reasonably conclude that any delay in the MCC providers dispensing antibiotics or recommending that Mr. Beck be seen at the hospital was nothing more than medical negligence, which would not provide the basis for a constitutional violation. *See Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020).

[29] The Court recognizes that Mr. Beck raised concerns over his finger during med pass as early as July 20, 2020, but Mr. Beck himself recognizes that detainees are supposed to use the kiosk to seek medical attention, which he eventually did. Doc. 31 at 17 (citing Doc. 31-1 at 4).

23, 2021) ("As Plaintiff himself alleges, [the defendant] was aware of Plaintiff's condition, aware he had medication on order, and aware that he was receiving care from medical staff. [The defendant] thus was justified in his reliance on the medical expertise of those tasked with Plaintiff's care."); *Daniels v. Janca*, GF-17-906, 2019 WL 2772525, at *5 (N.D. Ill July 2, 2019) ("[I]t was not unreasonable for [the defendant] to decline [plaintiff's] request for his medication instead of "second-guess[ing]" the pill line report and [plaintiff's] medical records."). It is the rare case where "it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment." *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (internal quotation omitted).

Nevertheless, non-medical professionals cannot "simply ignore an inmate's plight," and a plaintiff must show that his "communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." A*rnett v. Webster*, 658 F.3d 742, 755-56 (7th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This legal principle stands in juxtaposition to "the mere mishandling of the grievance process," which, on its own, is insufficient to support a § 1983 claim. *Velazques v. Williams*, TMD-14-9121, 2015 WL 4036157, at *3 (N.D. Ill. June 30, 2015) (citing *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir.2011)). Once an official knows of such a risk, "the refusal or declination to exercise the authority of his or her office may reflect" the requisite disregard. *Arnett*, 658 F.3d at 756 (internal quotation omitted); *see also Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) ("[A] guard who is aware of complaints of pain and does nothing to help a suffering prisoner obtain treatment is likewise exhibiting deliberate indifference."); *Lewis v. McLean*, 864 F.3d 556, 565 (7th Cir. 2017) (condemning prison personnel for doing "literally, nothing" despite having notice of prisoner's medical complaints and issues).

Here, the record shows that the correctional officers were aware of MCC's treatment of Mr. Beck's hand, because, *inter alia*, at least one correctional officer forwarded a relevant treatment request to MCC on July 22, 2020. And, Mr. Beck testified that he informed everyone he saw on July 23, 2020, that he was in pain due to his finger. Yet, the officers did not forward or otherwise respond to Mr. Beck's July 23, 2020, afternoon grievance regarding his infected hand until the next morning. The grievance clearly indicated that Mr. Beck was receiving inadequate treatment from MCC, he was in extreme pain, and his symptoms were not lessening. This is the type of apathy that can subject non-medical personnel to constitutional scrutiny.[30]

As indicated above, "[t]o have a viable *Monell* claim for damages, a plaintiff must show a violation of his constitutional rights by an individual defendant," which in turn was caused by an official policy. *Dereen v. Anderson*, 72 F.4th 229, 237 (7th Cir. 2023) (citing *Novoselsky v. Brown*, 822 F.3d 342, 3557 (7th Cir. 2016)). While the officers' failure to timely respond could, arguably amount to a constitutional violation, Plaintiff has not named any officer as a defendant. In addition, the officers' failures are not actionable under a respondeat superior theory. The only remaining avenue of Section 1983 liability for their actions rests on whether they acted pursuant to an unconstitutional policy of the Sheriff.

The Sheriff's Official Capacity Liability

For the reasons discussed *supra*, to the extent Mr. Bustos is sued in his official capacity as Sheriff, the claim is treated as a claim against the Sheriff's Department and is only viable pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978). *See, e.g.,*

---

[30] Causation here is less clear. *See Grieveson v. Anderson*, 538 F.3d 763, 772-73 (7th Cir. 2008) ("Seeing as the jail did not have to employ any grievance procedure whatsoever under the Fourteenth Amendment, it is hard to understand how the implementation of one—even one that did not function perfectly—would actually cause [an underlying constitutional injury].") (citation omitted).

*Demos v. Schneider*, TMD-23-741, 2023 WL 7166730, at *3 (N.D. Ill. Oct. 27, 2023). Thus, Mr.

Beck's § 1983 action is analyzed under the framework set forth in *Monell*.

Under *Monell* there are "three bases for municipal liability: (1) an express policy that

causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent

and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional

injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d

611, 617 (7th Cir. 2019) (quotation and citation omitted); *see also Taylor v. Hughes*, 26 F.4th 419

435-36 (7th Cir. 2022) Additionally, a "'policy of inaction' in light of notice that its program will

cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate

the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quoting *City of Canton v.*

*Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part and dissenting in part)); *see*

*also Woodward v. Corr. Med. Servs. of Ill., Inc*., 368 F.3d 917, 929 (7th Cir. 2004) ("[A] single

violation of federal rights can trigger municipal liability if the violation was a "highly predictable

consequence" of the municipality's failure to act.") (citing *Bd. of Cty. Comm'rs of Bryan Cty. v.*

*Brown*, 520 U.S. 397, 404 (1997)). Furthermore, "[m]unicipalities do not face *respondeat superior*

liability under section 1983 for the misdeeds of employees or other agents. Only actions of the

entity will suffice." *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021).

Before diving into what may or may not be a constitutionally inadequate policy, the Court

notes that it is clear, from the Response and the Amended Complaint, that Mr. Beck has not alleged

the existence of a relevant policy, nor has Mr. Beck briefed the court on any other basis for *Monell*

liability (*e.g.*, failure to train, etc.). This is despite Mr. Beck's Rule 26(a)(1) and (2) disclosures

(*see* Doc. 32-1 at 58-65) indicating that numerous individuals, including Sheriff Bustos, would

"have discoverable information concerning Defendant's policies and procedures, both in general

and regarding the Rockford County Jail's providing of medical treatment to its inmates." *Id.* at 59. This lacuna is especially concerning given the stage of litigation. Summary judgment is the stage where a plaintiff "'must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Indeed, "[i]t would defeat the purpose of summary judgment if Plaintiff were allowed to proceed to trial on a claim whose contours she has never clearly articulated." *M.R. v. Burlington Area Sch. Dist.*, JPS-21-1284, 2023 WL 3510642, at *28 (E.D. Wis. May 17, 2023) (internal quotation and citation omitted). In this way, "a defendant cannot win summary judgment on a claim the plaintiff never pleaded." *Chi. Mercantile Exch. Inc. v. ICE Clear US, Inc.*, MFK-18-1376, 2020 WL 1848090, at *2 (N.D. Ill. Apr. 12, 2020). Furthermore, "it is not the province of the courts to complete litigants' thoughts for them" and so courts routinely refused to address "undeveloped argument[s]." *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991)). However, in an ambitious exercise of prudence, this Court shall address the possible merit of Mr. Beck's unpled *Monell* claim as to the Sheriff's Department.[31]

Nevertheless, the evidentiary record is insufficient to show a widespread practice of ignoring the serious medical needs of detainees, as Mr. Beck improperly relies on one isolated incident. *See Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015) (a *Monell* claim requires "a widespread practice that permeates a critical mass of an institutional body," not "individual misconduct"); *see also Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023). While a Court may consider evidence of other similar instances of misconduct, Mr. Beck does not assert

---

[31] Similarly, the Court discusses Mr. Beck's *Monell* claim as to the County, despite the rather glaring pleading improprieties.

similarities among other detainees. See *Carmona v. City of Chi.*, AJS-15-00462, 2018 WL 1468995, at *2 (N.D. Ill. Mar. 26, 2018) (collecting cases). Moreover, the record appears to show that the Sheriff's policy, though not proffered before the Court, results in frequent treatment. Mr. Beck was seen by MCC four times between July 22, 2020, and the morning of July 24, 2020, his medical requests to MCC were not hampered by the Jail staff, and his only other grievance within that span was forwarded to MCC almost instantaneously. Although Mr. Beck's injury is unfortunate, the record only supports the conclusion that the staff command's failure to forward Mr. Beck's emergency medical grievance of July 23, 2020, to MCC was a "random event," not a "true municipal policy." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006) (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)).[32]

To the extent that Mr. Beck could assert a *Monell* violation under a theory that the Sheriff failed to train the Jail shift commanders on how to handle grievances, such an argument would fail. Liability for the failure to train carries "a stringent standard of fault" that requires a "pattern of similar constitutional violations," except for a "narrow range of circumstances" in which "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 62-94 (citation omitted). In such cases, the "risk of constitutional violations [is] so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020). "Qualifying circumstances under this doctrine are rare; [a] constitutional violation must be a blatantly obvious

---

[32] If Mr. Beck had argued that MCC's decision not to immediately send Mr. Beck to the emergency room was due to an unconstitutional policy to, *inter alia*, delay off-site care, then such a claim would have been appropriately lodged against MCC itself. *See, e.g.*, ELH-15-3278, 2022 WL 4290528, at *59 (D. Md. Sept. 16, 2022).

consequence of inaction for single-incident liability to apply." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quotation and citation omitted).

Nothing in the record indicates a pattern of untimely responses to grievances. Nor does the evidence permit a sensible jury to conclude that any training as to the grievance protocol was so blatantly deficient that it created a high risk of constitutional injury.[33] In sum, no reasonable jury could conclude that Mr. Beck has demonstrated the existence of a policy or custom that contributed to the violation of his constitutional rights.[34] Therefore, the Motion is GRANTED as to Mr. Bustos in his official capacity as Sheriff.[35]

---

[33] Similarly, a claim lodged under a failure to supervise theory would fail as well, as such claims "are a 'tenuous' form of *Monell* liability." *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019) (citation omitted).

[34] As Plaintiff has not alleged a constitutionally violative policy or custom, Plaintiff cannot show that a Sheriff's Department "policy or custom demonstrates municipal fault." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021) (internal quotation and citation omitted); *see also Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002)). For the same reason, Plaintiff cannot possibly connect a custom or policy with his constitutional injury. *See Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023) "[A] plaintiff seeking to hold a municipality liable must show causation. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (internal quotation and citation omitted).

[35] The Court notes that the record is unclear as to whether any correctional officer had access to the July 23, 2020, 3:12 pm grievance until the next morning. It certainly seems like a deficient practice for no officers to have access to the grievances within the general shift command mailbox for approximately 15 hours. However, when applied to the facts at issue, Mr. Beck clearly had the ability to contact a correctional officer. Indeed, he did so just a day earlier when he filed a grievance to the second shift command and Mr. Browne responded almost immediately. And, as noted, he could have sent an additional message to medical, or he could have used the intercom system or informed a correctional officer during the half-hour watch tour. To the extent that Mr. Beck's testimony that he informed "everyone that came in" about his finger covers the latter, and with no effect, it appears reasonable for a correctional officer to rely on MCC's medical decisions, as the record shows that Mr. Beck was in receipt of ongoing treatment.

<u>Sheriff's Individual Capacity Liability</u>

"'Individual liability under § 1983 ... requires personal involvement in the alleged constitutional deprivation.'" *Gasaway v. Vigo County Sheriff's Dep't*, ___ F. Supp. 3d ___, 2023 WL 3289117, at *4 (S.D. Ind. 2023) (quoting *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). "'[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly.'" *Epple v. Plasse*, ___ F. Supp. 3d ___, 2023 WL 2060048, at *4 (S.D. Ind. 2023) (quoting *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018)). "Thus, a high level official normally cannot be held liable for 'clearly localized, non-systemic violations.'" *Turner v. Cook Cty. Sheriff's Office by & through Dart*, HDL-19-5441, 2020 WL 1166186, at *4 (N.D. Ill. Mar. 11, 2020) (quoting *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996)).

Nevertheless, a sheriff can also be personally liable under § 1983 "'if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.'" *Liksa v. Dart*, 60 F. Supp. 3d 889, 901-02 (N.D. Ill. July 23, 2014) (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). Indeed, while "an individual must be personally responsible for a constitutional deprivation in order to be liable, personal responsibility is not limited to those who participate in the offending act." *Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015). Thus, if a sheriff "'personally devise[s] a deliberately indifferent policy that cause[s] a constitutional injury, then individual liability might flow from that act.'" *Lamb v. Cnty. of Lake*, EEC-20-3592, 2021 WL 4306144, at *5 (N.D. Ill. Sept. 22, 2021) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998)). Additionally, a sheriff may be personally liable if he "know[s] about the [unconstitutional] conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye." *Harris v. Dart*, SLR-20-7602, 2023 WL 2988816, at *5 (N.D. Ill Apr. 18,

2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). In essence, "[w]hile the plaintiff need not allege the defendant's 'direct participation,' he must demonstrate that the defendant 'acquiesced in some demonstrable way in the alleged constitutional violation.'" *Foster v. Costello*, RRP-13-3066, 2014 WL 1876247, at \*6 (N.D. Ill. May 9, 2014), *rev'd on other grounds sub nom*, *Foster v. Principal Life Ins. Co.*, 806 F.3d 967 (7th Cir. 2015) (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)).

Here, neither the Amended Complaint nor the evidence indicates any connection between Mr. Bustos's localized individual conduct and Mr. Beck's alleged constitutional injury. Nor does Mr. Beck's establish that Mr. Bustos assented to conduct or a policy, whether through action or apathy, that was constitutionally violative. Indeed, Mr. Beck testified at his deposition that he never spoke to Mr. Bustos about his injury and that he did not know why he was suing Mr. Bustos. Doc. 30-1 at 23. And so, this Court joins other district courts in Illinois in concluding that Mr. Bustos is not personally liable under § 1983, as Mr. Beck failed to demonstrate that Mr. Bustos was involved in medical treatment generally or was even aware of Mr. Beck's medical issue. *See, e.g.*, *Dickerson v. Durant*, MMM-23-3144, 2023 WL 3020497, at \*2 (C.D. Ill. Apr. 20, 2023); *Winfield v. Dart*, JFH-13-8237, 2014 WL 983137, at \*3 (N.D. Ill. Mar. 13, 2014); *Hahn v. Walsh*, 915 F. Supp. 2d 925, 950 (C.D. Ill. 2013); *Shultz v. Dart*, GF-13-3641, 2013 WL 5873325, at \*3 (N.D. Ill. Oct. 31, 2013); *Banks v. Dart*, RAG-12-4334, 2012 WL 2072381, at \*1 (N.D. Ill. June 7, 2012); *Castaldo v. Dart*, CRN-09-3751, 2011 WL 5118824, at \*6 (N.D. Ill. Oct. 26, 2011); *Cox v. Hartshorn*, 503 F. Supp. 2d 1078, 1086 (C.D. Ill. 2007). In light of the foregoing, the Motion is GRANTED as to Mr. Bustos's individual capacity liability.

<u>The County's Liability</u>

As alluded to, the County, due to its status as a municipality, is only subject to liability under § 1983 pursuant to *Monell.* Thus, Mr. Beck must satisfy "three requirements to establish [his] *Monell* claim—policy or custom, municipal fault, and 'moving force' causation." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022).

Mr. Beck does not suggest, through his Amended Complaint, Response, or otherwise, that a County policy somehow caused his injury. And, given the aforementioned disconnect between the County and the Sheriff, it is not entirely clear how the County could have possibly been involved in Mr. Beck's alleged constitutional deprivation. While not briefed by the parties, the only detail that seemingly ties the County to the Jail is the undisputed fact that it is the County, not the Sheriff, that contracts with MCC. SOF ¶ 4.

However, as noted, "[s]ection 1983 bars *respondeat superior* liability as to local governmental units, so '[m]ost inmates who believe their right to health care has been violated [ ] seek damages from individual doctors or other health care professionals, or from correctional staff who might have ignored or interfered with the inmates' efforts to seek the health care they need.'" *Boyce v. Wexford Health Sources, Inc*., AJS-15-7580, 2017 WL 1436963, at *11 (N.D. Ill. Apr. 24, 2017) (quoting *Daniel v. Cook Cnty.*, 833 F.3d 728, 733 (7th Cir. 2016)). Indeed, "'It is somewhat unusual to see a [section 1983] case relating to medical care in a prison in which the plaintiff does not argue that the individual medical provider was deliberately indifferent to a serious medical need.'" *Williams v. Illinois Dep't of Corr.*, MAB-19-739, 2023 WL 1472246, at *20 n.19 (S.D. Ill. Feb. 2, 2023) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017)).

31

Here, despite initially naming MCC and Mr. Josie in his suit, Mr. Beck eschewed doing so in his Amended Complaint. This is somewhat curious, as Mr. Beck's other § 1983 lawsuit in the Southern District of Illinois, in which he alleged deliberate indifference to his serious medical needs, named a prison medical care provider and two medical professionals. *See Beck v. David*, NJR-20-41, 2020 WL 902759 (S.D. Ill. Feb. 25, 2020). That case recently survived summary judgment as to one of the medical professionals. *See Beck v. David*, NJR-20-41, 2023 WL 6929011 (S.D. Ill. Oct. 19, 2023).

While this Court refrains from speculating as to the possible success of Mr. Beck's suit had he continued to name individual medical providers or MCC, as his case currently stands, there exists no basis for a reasonable jury to conclude the existence of a County custom, practice, or policy that impacted MCC's provision of medical services and thus caused the deprivation of Mr. Beck's right to adequate health care under the Fourteenth Amendment.[36] Accordingly, the Motion is GRANTED as to the County.[37]

---

[36] Of course, the County "'cannot shield itself from § 1983 liability by contracting out its duty to provide medical services.'" *Andrews v. Cnty. of Sangamon*, SEM-18-1100, 2021 WL 3733142, at *7 (C.D. Ill. July 1, 2021) (quoting *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012)). If, for example, there was evidence that MCC was woefully underfunded to meet the needs of the population at the Jail or the County directed healthcare providers to limit care to detainees, then perhaps some sort of 1983 liability could be attached to a County policy. *See Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016). But, the record, when viewed in favor of Mr. Beck as the non-movant, does not support the contention that the County, whether on its own or through contracting with MCC, operated a constitutionally violative policy.

[37] For the same reasons that Plaintiff fails to establish *Monell* liability as to MCC, the individual medical providers, and the County, he fails to establish it as to the Sheriff's Department. I note this because the Court is skeptical, despite the parties' apparent agreement, that it was actually the County that contracted with MCC. *See, e.g.*, *DiMaio v. Wexford Health Sources, Inc.*, FUV-19-6613, 2021 WL 1056848, at *1 (N.D. Ill. Mar. 19, 2021) ("The Kane County Sheriff's Office contracted with Wexford to provide healthcare services to KCAJC inmates."). Indeed, "[e]ven with the assent of all parties, judges still have the obligation to reject stipulations that are not factually true." *See In re Deepwater Horizon*, 753 F.3d 516, 520 (5th Cir. 2014) (Clement, J., dissenting).

**Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 30) is GRANTED in its entirety. The District Clerk is directed to CLOSE the case.

Entered on this 15th day of November 2023.

s/ *James E. Shadid*
UNITED STATES DISTRICT JUDGE
